# 2000 DTA 160

## TRIBUNAL DE CIRCUITO DE APELACIONES
## CIRCUITO REGIONAL DE MAYAGUEZ/AGUADILLA

GASOLINAS DE PUERTO RICO CORP.
Apelante

v.

ESSO STANDARD OIL COMPANY (PR), JORGE LUIS SANCHEZ SOLER Y JESSICA LEE VIVALDI ARROYO, POR SI, EN REP. DE, Y COMO MIEMBROS DE LA SOCIEDAD LEGAL DE BIENES GANANCIALES POR ELLOS CONSTITUIDA
Apelados

Núm. KLAN-2000-00504

San Juan, Puerto Rico, a 19 de junio de 2000

Panel integrado por su Presidenta, la Juez López Vilanova
y los Jueces Córdova Arone y Escribano Medina

Escribano Medina, Juez Ponente

## TEXTO COMPLETO DE LA RESOLUCION

Comparece la demandante-apelante, Gasolinas de Puerto Rico Co., solicitando la revocación de una sentencia parcial dictada por el Tribunal de Primera Instancia, Sala Superior de Mayagüez, (Hon. Luis Rivera Román). Mediante ésta, se declara con lugar una Moción de Sentencia Sumaria. Los demandantes-apelantes presentaron su alegato el 1 de mayo de 2000 y los demandados-apelados presentaron su oposición el 31 de mayo de 2000. Estamos en posición de resolver.

### I

A principios del año 1994, Gasolinas de Puerto Rico (GPR) y el Dr. Jorge Sánchez Soler (Dr. Sánchez) iniciaron negociaciones con la intención de establecer en Mayagüez una estación de Gasolina. Para el 11 de marzo de 1994, el Dr. Sánchez, por falta de capital para invertir, recibió un cheque emitido por GPR por la cantidad de diez mil (10,000) dólares. Este dinero se utilizaría para opcionar la compra del solar que el Dr. Sánchez interesaba adquirir. Simultáneamente, GPR le envió al Dr. Sánchez la primera propuesta para la realización del proyecto. Esta primera propuesta no fue aceptada.

El 14 de marzo de 1994, se otorgó un contrato de opción entre la Cooperativa Colegial de Solares de Mayagüez y el Dr. Sánchez. El 25 de marzo y el 2 de mayo de 1994, GPR envió la segunda y tercera propuesta, respectivamente, que tampoco fueron aceptadas. En todas las propuestas, GPR se comprometía a realizar los trámites para obtener los permisos correspondientes para la construcción de la estación de gasolina. En ese período de tiempo, el Dr. Sánchez facturó el repago de facturas por servicios profesionales en relación con los gastos incurridos en ingenieros, agrimensores y estudios para el proyecto en cuestión; GPR pagó todos estos gastos. GPR comenzó, para el año 1994, los trámites para la obtención de los permisos, tanto en la Administración de Reglamentos y Permisos (ARPE) como en el Departamento de Transportación y Obras Públicas (DTOP). Estas gestiones continuaron en los años 1995 y 1996.

El 12 de abril de 1995, el Dr. Sánchez adquirió el solar mediante escritura Núm. 48 otorgada ante notario y ese mismo día se constituyó hipoteca a favor del Banco Popular de Puerto Rico. Debido a la dificultad para conseguir los permisos, GPR envió al Dr. Sánchez una carta con fecha del 26 de mayo de 1995 en la que se expresó que el proyecto sería retirado del presupuesto del año fiscal 95-96 por la incertidumbre del resultado. Le manifestó, además, que si se aprobaran los permisos, entonces se sometería una petición especial de fondos para darle continuidad al proyecto.

El 27 de junio de 1995, ARPE aprobó un ante proyecto, condicionado a que el DTOP apruebe el permiso de acceso a la vía pública solicitado por GPR y el Dr. Sánchez. Se presentaron varias propuestas de acceso ante el DTOP y todas fueron denegadas. A finales de 1995 y principios del 1996, el Dr. Sánchez recibió un acercamiento a iniciativa de ESSO Standard Oil Co. para negociar la realización del proyecto. ██ El 8 de mayo

de 1996, GPR envió una carta de confirmación de conversación telefónica en donde se pide la autorización del Dr. Sánchez para gestionar la aprobación final de las alternativas propuestas de acceso al DTOP. El 13 de mayo de 1996, el Dr. Sánchez y ESSO otorgaron un acuerdo privado sobre negociación en la que se acordó el arrendamiento del solar por un término de veinte (20) años, con una renta escalonada ascendente a $1,680.000.00 durante la vida total del contrato. ■ El 4 de junio de 1996, GPR envió otra carta en la cual se le pide nuevamente al Dr. Sánchez que de el endoso para que GPR pueda conseguir la aprobación de los accesos solicitados. El 5 de junio de 1996, el Dr. Sánchez, por medio de una carta, ■ le solicitó a la Arquitecto Olga Rivera que hiciese las gestiones para obtener la aprobación final de los permisos. El 13 de junio de 1996, el Ing. Bonín; en representación de GPR, envió una carta al DTOP donde hace una propuesta de acceso a la propiedad. El 21 de junio de 1996, ARPE concede una prórroga de un año al ante proyecto otorgado a la propiedad del Dr. Sánchez. El 9 de agosto de 1996, el DTOP envió una carta al Ing. Bonín de GPR denegando la propuesta del 13 de junio de 1996. Luego de esta denegatoria, se dejó en manos del Dr. Sánchez la tramitación de los permisos en el DTOP. ■ El 4 de septiembre de 1996, los representantes del Dr. Sánchez enviaron una carta al DTOP en la que se le presentan nuevas propuestas de acceso a la propiedad. El 3 de octubre de 1996, ESSO emite un endoso para autorizar al Ing. Colón Pratts a hacer cualquier gestión encaminada a conseguir los permisos necesarios para la construcción de la estación de gasolina en la propiedad del Dr. Sánchez. El 13 de enero de 1997, Benjamín Martínez, gerente general de GPR, le envía una carta al Dr. Sánchez preguntándole nuevamente si tiene algún acuerdo con la ESSO para el desarrollo del solar de su propiedad. ■ El 29 de enero de 1997, ESSO obtuvo la aprobación del permiso de construcción para la obra. Mediante escritura pública sobre constitución de arrendamiento, otorgada el 2 de mayo de 1997, el Dr. Sánchez arrendó el solar a ESSO por 20 años. ESSO le cedió el derecho de operación de la estación a Carlos Ferrer Zapata mediante contrato del 29 de mayo de 1997.

El 17 de junio de 1997, GPR demandó a ESSO y al Dr. Sánchez y a su esposa por haber interferido en la relación contractual que existía entre GPR y el codemandado Dr. Sánchez para establecer una estación de gasolina en el Municipio de Mayagüez. El 3 de noviembre de 1999, ESSO presentó Moción de Sentencia Sumaria. El Dr. Sánchez presentó también moción de Sentencia Sumaria el 10 de noviembre de 1999. GPR radicó oposición a la misma el 20 de enero de 2000. El Tribunal emite Sentencia Parcial, el 30 de marzo de 2000, en la cual desestima la causa de acción de los demandantes GPR en cuanto a la acción de daños y perjuicios. GPR radicó su escrito de apelación el 1 de mayo de 2000 ante el Tribunal de Circuito de Apelaciones señalando al foro de instancia los siguientes errores.

*"1. Erró el Tribunal de Instancia al concluir que nunca hubo un contrato entre GPR y Sánchez, cuando los actos coetáneos y posteriores de ambas partes, evidencian lo contrario.*

*2. Erró el Tribunal de Instancia al concluir que GPR se había retirado unilateralmente del proyecto pactado con Sánchez.*

*3. Erró el Tribunal de Instancia al concluir que no hubo una interferencia contractual de ESSO en la relación contractual entre Sánchez y ESSO.*

*4. Erró el Tribunal de Instancia al desestimar sumariamente las causas de acciones de la demandante, a pesar de existir claras controversias de hechos que impedían la disposición sumaria del caso.*

*5. Erró el Tribunal al denegar el repago de las cuantías invertidas por la demandante en el negocio contratado con Sánchez, permitiendo un claro enriquecimiento injusto de las demandadas.*

*6. Erró el Tribunal al imponer honorarios de abogado por temeridad."*

Por la interrelación de los errores señalados, los discutiremos en conjunto.

## II

Reiteradamente, hemos expresado que las Reglas 36.1 y 36.2 de Procedimiento Civil, 32 L.P.R.A. Ap. III, permiten a los tribunales dictar una sentencia mediante la cual dispongan total o parcialmente de determinada reclamación sin necesidad de celebrar un juicio en sus méritos. El Tribunal Supremo ha establecido que el propósito principal de la moción de sentencia sumaria, según dispone la Regla 36 de las de Procedimiento Civil, 32 L.P.R.A. Ap. III, es propiciar la resolución justa, rápida y económica de litigios que no presentan controversias genuinas de hechos materiales y, por lo tanto, no ameritan la celebración de un juicio en su fondo. *González v. Alicea,* 132 D.P.R. 638; *Worldwide Food v. Alberic Colón,* **93 J.T.S. 114**; *Rivera v. Superior Packaging,* 132 D.P.R. 115; *Tello Rivera v. Eastern,* 119 D.P.R. 83. Utilizada correctamente, la misma contribuye a descongestionar los calendarios judiciales. *Rivera v. Superior Packaging, supra; Méndez v. El Vocero,* 130 D.P.R. 867.

Procede dictar sentencia sumariamente cuando no exista una controversia real sustancial respecto a ningún hecho material. Al considerar la moción de sentencia sumaria, se tendrán como ciertos los hechos no controvertidos que consten en los documentos y las declaraciones juradas ofrecidas por la parte promovente. La parte opositora, a su vez, debe presentar documentos y declaraciones juradas que controviertan los presentados por la parte promovente. *INCA v. Ileana Colón Carlo,* **93 J.T.S. 112.** Si la parte opositora se cruza de brazos, corre el riesgo de que se dicte sentencia en su contra sin la celebración de una vista en su fondo. *Mercado Vega v. U.P.R.,* 128 D.P.R. 273. Ahora bien, la sentencia sumaria sólo debe dictarse en casos claros y cualquier duda sobre si un hecho ha sido o no contradicho, debe resolverse en contra de la parte promovente. *Rivera Santana v. Superior Packaging, Inc., supra.* Por otro lado, se puede dictar sentencia sumaria a favor de la parte no promovente, si de los documentos presentados en apoyo de la moción, surge que no existe controversia en cuanto a los hechos esenciales y, como cuestión de derecho, procede que la misma se dicte a favor de dicha parte. *Piñero v. A.A.A.,* **98 J.T.S. 140**; *Consejo Tit. C. Parkside v. MGIC Fin. Corp.,* 128 D.P.R. 538.

La sentencia sumaria es un remedio extraordinario que sólo debe ser concedido cuando el promovente ha establecido su derecho con claridad y ha quedado demostrado que la otra parte no tiene derecho a recobrar bajo cualquier circunstancia que resulte discernible de las alegaciones que no hayan sido refutadas por la evidencia presentada con la moción. *Corp. of the Presiding Bishop v. Purcell,* 117 D.P.R. 714.

Todos los hechos presentados en los documentos que acompañen la moción, deben verse de la forma más favorable para la parte que se opone a la moción, concediendo a esta parte el beneficio de toda inferencia que razonablemente se pueda derivar de ellos. *Jorge v. Universidad Interamericana,* 109 D.P.R. 505.

Una vez sometida una moción desestimatoria de sentencia sumaria y su oposición, el tribunal debe analizar todos los documentos que acompañan ambas mociones y determinar no sólo si el oponente controvirtió algún hecho material, sino también si hay alegaciones de la demanda que no han sido controvertidas o refutadas en forma alguna por los documentos que se acompañan. Si el tribunal determina que algún hecho material ha sido controvertido por la parte opositora o que hay alegaciones afirmativas en la demanda que no han sido refutadas, debe denegar la solicitud. Bajo estas circunstancias, existe una genuina controversia de hechos y la sentencia sumaria no procede. *Municipio v. Tribl. Superior,* 78 D.P.R. 816. Tampoco puede dictarse sentencia sumaria cuando de los propios documentos que se acompañan con la moción, surge una controversia real sobre algún hecho material, *Morales v. Junta Exam. de Ing.,* 99 D.P.R. 84, o cuando como cuestión de derecho no procede. *Corp. of the Presiding Bishop v. Purcell, supra.*

Examinados los documentos y deposiciones presentados por ambas partes, se puede concluir que hay controversia en cuanto a los hechos del caso. Es un hecho incontrovertible la intensidad de las negociaciones entre GPR y el Dr. Sánchez, tanto por las gestiones realizadas por GPR como por las transferencias de dinero entre ambas partes. Según surge de la documentación que acompaña los escritos de apelación, se puede inferir que ya para finales del año 1995 y todo el año 1996, el Dr. Sánchez estaba negociando con ESSO a espaldas de GPR.

De una lectura de los hechos del caso aquí expuestos, podemos observar que por lo menos hasta el 9 de agosto de 1996, GPR estaba intensamente trabajando para la realización del proyecto. El 13 de mayo de 1996, el Dr. Sánchez suscribió un contrato privado con ESSO pactando un arrendamiento a veinte (20) años sin que GPR tuviera conocimiento del mismo. Nótese que el monto total en renta es de un millón seiscientos ochenta mil dólares ($1,680.000.00). GPR hizo varios intentos de comunicación por carta con el Dr. Sánchez para conseguir la autorización para solicitar los permisos en DTOP. Aunque estas cartas fueron posteriores al contrato privado del 13 de mayo de 1996, el Dr. Sánchez en ningún momento le comunicó a GPR sobre el trato hecho con ESSO. Esto arroja serias dudas sobre cuándo se otorgó el contrato, y si se hizo o no se hizo con fecha retroactiva. ¿Por qué no se otorgó ante notario? ▮

En enero de 1997, GPR estaba en el convencimiento de que tenía una relación comercial con el Dr. Sánchez, aunque ya para esta época, ESSO había completado los trámites para la adquisición de la estación. De ello se puede inferir que el Dr. Sánchez actuó de mala fe por hacer una falsa representación a GPR.

Surgen muchas interrogantes en cuanto a las fechas de los hechos y el conocimiento de ESSO sobre las avanzadas negociaciones de GPR con el Dr. Sánchez. Entendemos que el simple análisis de los documentos que tuvo ante sí el Tribunal de Primera Instancia, no es suficiente para poder llegar a la determinación objeto del caso ante nos. ▮ Es necesario celebrar un juicio en su fondo para aclarar las lagunas que surgen claramente de los documentos y deposiciones que acompañan los escritos de apelación; solamente la comparecencia de los testigos para que declaren bajo juramento pueden colocar al Tribunal en posición para resolver en sus méritos los aspectos en controversia.

### III
Por todo lo antes expuesto, se revoca la sentencia parcial dictada por el Tribunal de Primera Instancia y se devuelve el caso para la continuación de los procedimientos.

Lo acordó el Tribunal y lo certifica la Secretaria General.

Aida Ileana Oquendo Graulau
Secretaria General