ZOLTAN E. ROTH, demandante y recurrente, *v.* ÁNGEL LUGO y ELVIRA PAGÁN, demandados y recurridos.

*Número:* 349  *Resuelto:* 15 de febrero de 1963

*Hernán R. Franco*, abogado del recurrente; *Oscar Castro Rivera*, abogado de los recurridos.

Sala integrada por el Juez Asociado Señor Belaval como Presidente de Sala y los Jueces Asociados Señores Hernández Matos y Santana Becerra.

EL JUEZ ASOCIADO SEÑOR SANTANA BECERRA emitió la opinión del Tribunal.

El 10 de junio de 1959 Ángel Lugo y su esposa Elvira Pagán dueños de una propiedad rústica de 163.2038 cuerdas sita en el Barrio Pájaros de Bayamón concedieron una opción a Carmen Betancourt para la compra de dicha propiedad, en consideración a la cantidad de $4,000 que les fue pagada por ésta. El precio de la venta sería a razón de $2,000 la cuerda y se haría un pago inicial del 25 por ciento al otorgarse la escritura. Los dueños convinieron en pagar a Carmen Betancourt y al demandante Zoltan E. Roth, si se ejercitaba la opción y al hacerse el pago inicial, una comisión de 5 por ciento del precio de compra por sus servicios como corredores en la transacción. Los $4,000 se acreditarían al pago inicial si se ejercitaba la opción, de lo contrario serían de los dueños. La opción de compra quedaba extinguida el

10 de diciembre de 1959. Aunque la aceptante venía obligada a informar a los dueños por escrito su determinación de ejercitar el derecho de opción en o antes de esa fecha, tendría no obstante sesenta días adicionales para cerrar la compra. Se dispuso que los derechos de la aceptante bajo dicha opción podrían ser cedidos a aquellas personas que "ellos" designaran. El mismo día 10 de junio de 1959 la opción de compra fue cedida por Carmen Betancourt a Roth o sus cesionarios, quien adquirió el derecho de opción desde entonces.

En esta acción sobre cumplimiento específico interpuesta por Roth contra los dueños de la propiedad se alegó en la demanda que él les comunicó dentro del plazo fijado en la opción su determinación de ejercitar la misma, estando listo y dispuesto a dar cumplimiento a todas las condiciones acordadas en la opción mediante el otorgamiento de la correspondiente escritura de compraventa, y que los dueños demandados se negaron a ello. Pidió el cumplimiento específico de dicho contrato y daños en la suma de $255,000 en caso de que no se ordenare el mismo.

Contra la demanda los demandados interpusieron una moción sobre sentencia sumaria pidiendo su desestimación porque la opción en que el demandante fundaba su derecho a pedir había sido cedida y vendida a la firma Gus P. Nichols Co. en 22 de octubre de 1959; y porque en noviembre 14, 1959 la firma Gus P. Nichols había ejercitado la opción mediante comunicación enviada a los demandados y al demandante.

El contrato de opción de 22 de octubre de 1959 otorgado entre Roth y Gus P. Nichols, que se acompañó a la moción sobre sentencia sumaria, hace constar que Gus P. Nichols Co. deseaba comprar el referido derecho de opción que tenía Roth, y estipularon que en consideración de la suma de $2,500 pagada en efectivo Roth "transfería, negociaba y vendía" a Nichols el derecho exclusivo y opción a adquirir la opción que tenía Roth sobre la referida propiedad, con arreglo a los términos y condiciones de la opción original. Esta opción a

comprar la opción se concedió sujeta a las siguientes cláusulas: (1) que su término se extendería hasta el 16 de noviembre de 1959; (2) que al ejecutarse la opción de compra y traspaso de la propiedad por Lugo y su esposa a la aquí aceptante Nichols o sus cesionarios, el oferente Roth recibiría la suma de $27,500 como balance del precio de compra de esta opción, junto a los $2,500 originalmente pagados; (3) que el precio de compra total de $30,000 incluiría todo derecho, título e interés del oferente Roth sobre todo depósito pagado al dueño del inmueble según la opción original. Si la aceptante dejare de ejercitar esta opción dentro del término estatuido en el documento, el oferente tendría derecho a retener los $2,500, como daños líquidos.

En noviembre 14 de 1959 Gus P. Nichols Co. dirigió una comunicación a los dueños, que se acompañó a la moción sobre sentencia sumaria, informándoles del convenio de 22 de octubre de 1959 con Roth; que en esta fecha, 14 de noviembre de 1959, ella había ejercitado la opción para comprar la opción de Roth, y que esta comunicación les serviría de aviso en cuanto a su intención de adquirir la propiedad de acuerdo con la opción original de 10 de junio de 1959. Fechada 9 de diciembre de 1959 hay una carta de Roth dirigida al abogado de los demandados Lcdo. Oscar Castro Rivera informándole que al cierre con Nichols del contrato de opción respecto a las 163 cuerdas de Lugo, el balance de $27,500 pagadero al cierre se entregaría a dos personas que mencionaba, $15,000 a una de ellas y $12,500 a la otra. Hizo constar que él había obtenido la opción sobre la propiedad de Lugo a su nombre pero representaba el 50 por ciento de los intereses de cada una de estas personas. Esta carta también se acompañó a la moción, así como la declaración jurada del demandado Lugo haciendo constar que transcurrido el término de sesenta días estipulado en la opción original de 10 de junio de 1959, los tenedores de la opción Gus P. Nichols Co. no

"pidieron" levantar la cantidad necesaria para el pronto pago y solicitaron una prórroga a la cual el declarante se negó, y expiró el plazo de la opción.

En oposición a la moción sobre sentencia sumaria, el demandante Roth acompañó su declaración jurada y expuso que el contrato de opción para comprar la propiedad de los demandados nunca fue cedido por él a Nichols; que por el acuerdo de 22 de octubre de 1959 el declarante concedió a Nichols una opción para comprar, en o antes de noviembre 16, 1959 y mediante el pago por Nichols de $27,500, la opción suya para comprar la propiedad de los demandados; que Nichols no cumplió con los términos para la compra de su opción, quedando nulo y sin efecto el referido acuerdo de opción, y la compañía nunca pagó los $27,500. Que nunca existió relación contractual entre los demandados y Nichols sobre el derecho de compra dado por ellos al declarante y que los demandados en todo momento han tratado con el declarante y lo han reconocido como el dueño del derecho de opción de compra de su propiedad. Declaró Roth además que en 6 de febrero de 1960 los demandados le pidieron que cumpliera con los términos y condiciones de la opción que ellos le habían concedido; que él hizo todos los arreglos necesarios a tal fin, incluyendo la cita con un notario y los demandados para la ejecución formal de la opción pero los demandados nunca se presentaron a la hora y fecha acordadas. Acompañó a esta declaración copia de la referida carta fechada febrero 6, 1960 dirigida al demandante Roth por los demandados. Dice la misma: que se sirviera tomar nota que en febrero 8, 1960 expiraba el término dado para el cierre final del convenio de opción que ellos le habían otorgado a él y a la señora Betancourt, y que ellos insistían en el estricto cumplimiento de dicho convenio.

La Sala sentenciadora procedió a dictar sentencia sumariamente desestimando la demanda. Después de exponer las actuaciones de las partes antes descritas, expresó: "No obstante lo antes expuesto el término de la opción para la

compra de la propiedad de los esposos demandados venció el día 8 de febrero de 1960 o sea al vencimiento de los sesenta días de gracia otorgados por la estipulación (*a*) que se ha transcrito en el apartado 1.—*ante*. [opción original] sin que Gus P. Nichols Company ni el demandante ni persona otra alguna que resultare cesionaria de los derechos de éstos cumpliese con los términos del contrato ni que específicamente pagase u ofreciese pagar el primer plazo del precio de la compraventa o exigiese siquiera el otorgamiento de la escritura de compraventa". Expresó que tenía ante sí "todos los hechos que podrían producirse en un juicio formal no existiendo controversia real entre las partes sobre los mismos, excepto en cuanto a su interpretación y a la inferencia legal a derivarse de tales hechos", y procedía resolver la controversia sin más trámite.

Concluyó entonces la Sala sentenciadora (1) que Roth carecía de causa de acción para exigir el cumplimiento específico de la opción ya que al *cederla* a Nichols por el documento de 22 de octubre se desprendió de todos sus derechos sobre la misma; (2) que si el demandante Roth se hubiese reservado algún derecho bajo la opción no obstante haberla cedido, ésta quedó extinguida sin ulterior efecto legal al no cumplir él sus términos y condiciones y, (3) que habiendo quedado así extinguida la opción los demandados, quienes estuvieron dispuestos a cumplir con los términos de la misma hasta su expiración el 8 de febrero de 1960, no debían responder de daños por alegado incumplimiento. Se declaró sin lugar la demanda.

La Regla 36.3 de Procedimiento Civil de 1958 sobre sentencias dictadas sumariamente, dispone que "la sentencia solicitada se dictará inmediatamente si las alegaciones, deposiciones y admisiones hechas junto con las declaraciones juradas, si las hubiere, demostraren que no hay controversia real en cuanto a ningún hecho material y que como cuestión de derecho debe dictarse sentencia sumaria a favor de la parte que presentó la moción".

■ Una Regla que posiblemente en mayor grado que las demás responde al propósito de aligerar la conclusión de los pleitos eliminando el juicio en su fondo donde no existe una legítima disputa de hecho a ser dirimida y sólo resta aplicar el derecho, por una paradoja ha sido también, en grado mayor del deseable, un mecanismo que a la larga ha causado dilación, según se aprecia del inmenso número de fallos recopilados; como apuntan Barron y Holtzoff, por su uso injustificado y el considerable malentendido de este procedimiento, la Regla misma aparentemente perdida en medio de la casuística legal en el cúmulo de decisiones que la han aplicado. (¹) Si la Regla se aplica con sabio discernimiento, observa Moore, ayuda efectivamente al propósito de ella eliminando juicios inútiles. De no usarse así retarda una disposición final del caso justa. En un gran número de casos, apunta, el camino hacia la solución del problema de la existencia de una disputa genuina sobre un hecho esencial no es fácil, cualquier duda razonable en cuanto a si existe o no debe resolverse en contra de una sentencia dictada sumariamente. Los tribunales deben evitar la concesión indebida de sentencias sumarias que resultan o en injusticia o en la revocación con la correspondiente retardación del caso. Y si ha de haber error en el tribunal de instancia, sigue apuntando, que sea en contra de la sentencia sumaria y a favor de un juicio vivo; los problemas de congestión de casos no han de resolverse disponiendo sumariamente de contiendas de hecho justamente presentadas en una acción. (²)

---

(¹) Barron & Holtzoff *Federal Practice*, Rules Edition, págs. 96 y ss.

(²) Moore's *Federal Practice*, Vol. 6, 2ª ed., págs. 2012 y ss; 2121. Moore recoge un sentir prevaleciente en la utilidad del cual creemos, en torno a la apreciación adecuada de este mecanismo dirigido a abreviar la disposición de los casos, mirado a la luz del derecho básico a un juicio en los méritos en donde el arma del contrainterrogatorio juega papel tan fundamental en el esclarecimiento de la verdad. Del Juez Frank, en *Doehler Metal Furniture Co*. v. *United States*, (C.A. 2) 149 F.2d 130, 135: "Aprovechemos la ocasión para sugerir que los jueces sentenciadores deberían ejercer gran cuidado al conceder mociones de sentencias sumarias. Un litigante tiene el derecho a un juicio cuando exista la más mínima duda en cuanto a los hechos . . . . . tal sentencia, sabiamente

El procedimiento que permite dictar sentencia por la vía sumaria es, según de manera más o menos parecida se ha caracterizado, una punción a las alegaciones de hecho de las partes, sean reclamación o defensa, para escudriñar anticipadamente al juicio con elementos de prueba extrínsecos, o sin esos elementos de no ser necesario, lo que haya de ficticio, pretenso e irreal en los hechos alegados, y sacar a la luz la verdad en cuanto a si hay o no hay una disputa real y legítima en cuanto a los hechos, o sobre cualquier hecho esencial, que requiera la celebración de un juicio para dirimir la misma mediante la sustanciación de prueba ante el tribunal. Realizada esta función exploratoria termina la misión de este procedimiento, a ambos efectos.    De ratificarse que hay

usada, es un mecanismo encomiable para ahorrar tiempo. Pero, aunque el pronto despacho de los asuntos judiciales es una virtud, no es ni el único ni el primordial propósito para lo cual se han creado los tribunales. La negación de un juicio ante hechos disputados es peor que la dilación [cita]. Las cortes de distrito harían bien en tomar nota de que a menudo se ha perdido el tiempo debido a la revocación de sentencias sumarias impropiamente dictadas."

El mismo Juez Frank, en *Colby* v. *Klune* (C.A. 2) 178 F.2d 872, vuelve a expresar: "Tenemos de nuevo en este caso otro ejemplo lamentable del intento de ahorrar tiempo acudiendo indebidamente al 'juicio por *affidavit*'; indebidamente, porque hay envuelta una cuestión de hecho que gira en torno a credibilidad.  El juicio por testimonio oral, con la oportunidad de interrogar y contrainterrogar testigos en corte abierta, con frecuencia se ha proclamado como uno de los distintivos más valiosos del derecho común.  Pues sólo en tal juicio puede el juzgador de los hechos (juez o jurado) observar el proceder del testigo; y ese proceder—que está ausente, por supuesto, cuando el juicio es por *affidavit* o deposición,— se acepta como un indicio importante hacia la credibilidad del testigo. Entonces, cuando como aquí, la determinación (lo más cerca posible) de los hechos de un caso gira en torno a credibilidad, existe una controversia de hecho dirimible en el juicio y constituye error dictar una sentencia sumaria . . . . .  Oímos mucho de la congestión de casos pendientes como la causa de dilaciones deplorables en la administración de justicia.  La manera de eliminar esa congestión es nombrando un número suficiente de jueces, no cometiendo injusticia despojándose a los litigantes de un medio justo de juicio."

El Juez Learned Hand en *Bozant* v. *Bank of New York,* (C.A. 2) 156 F.2d 787, 790: "En definitiva no podemos dejar de observar que el caso es otro erróneo intento equivocado de ganar tiempo tratando de disponer de un estado de hecho complejo en una moción de sentencia sumaria. Esto es más cierto aun teniendo el demandante que depender en su acción

en el pleito una verdadera controversia sobre los hechos pertinentes, no es función lícita del tribunal juzgarla ni dirimirla en ese momento, aun cuando estuviere inclinado a creer que en un juicio en los méritos los hechos alegados por la parte contra quien se solicita la sentencia sumariamente tendrían poca, o menos oportunidad de prevalecer sobre los de la que pide sentencia. La inobservancia de esta norma ha producido no pocas revocaciones de sentencias sumariamente dictadas y conduce a lo que en relación con la Regla se ha llamado el "juicio por *affidavit*," forma ésta tan extraña al concepto procesal anglo-sajón que aquí rige que tiene como cosa básica el juicio oral adversativo. Por otra parte, cuando de la correcta evaluación de los hechos presentados no surge

de lo que pueda extraerle al demandado. [Cita] Parece que resulta un poco difícil el persuadir de esto a las cortes de distrito, pero estamos convencidos de que eso es cierto." Y disintiendo en *California Apparel Creators* v. *Wieder of California*, 162 F.2d 893, pág. 903: "Ciertamente, cuando veo, y como constantemente estoy viendo más y más, la tendencia en aumento de usar ese remedio, no puedo evitar preguntarme si no existe el peligro de que impida, más que adelante, la administración de justicia. Es un medio fácil para una corte con congestión de casos de disponer de ellos, y el hábito de recurrir a dicho remedio se convierte fácilmente en una negación de ese cabal aunque lento examen de los hechos, de lo cual la justicia depende aun más que del cuidadoso examen de la ley, ya que un error de derecho siempre puede ser revisado. La festinación y el apresuramiento deben ser las antípodas del proceder judicial."

En *Whitaker* v. *Coleman* (C.A. 5) 115 F.2d 305, habló el Juez Hutcheson así: [pág. 307] "El procedimiento de sentencia sumaria no es una trampa para coger a litigantes incautos en su red y privarlos de un juicio. Es una medida liberal, liberalmente concebida para llegar a la verdad. Su objetivo no es aislar a los litigantes de su derecho a un juicio por jurado si realmente tienen prueba que han de ofrecer en un juicio; es comprobar esto cuidadosamente con anticipación al juicio inquiriéndose y determinándose si tal prueba existe." Años después en *Gray Tool Co.* v. *Humble Oil & Refining Co.*, 186 F.2d 365, refiriéndose a una sentencia sumaria impropiamente dictada señaló que el eliminar súbitamente un juicio no es un fin sino un medio hacia un fin, y en la tramitación de casos como en otros empeños, a menudo es cierto que la vuelta alrededor más larga viene a ser el camino directo más corto.

"Una pronta disposición de casos," dijo el Juez Murrah en *Avrick* v. *Rockmont Envelope Co.*, (C.A. 10) 155 F.2d 568, 573, "es una virtud cardinal de la administración de justicia pero no es más importante que el derecho fundamental de uno a su día completo en corte."

una controversia de hecho entre las partes real y verdadera, el procedimiento también ha cumplido su misión, ya que lo otro es fallar con arreglo a derecho como en cualquier otro caso en que los hechos hayan sido dirimidos y adjudicados por el propio tribunal.(³)

La Regla 36.3 al igual que su equivalente federal 56(c) se manifiesta en lenguaje extremadamente sencillo: "La sentencia solicitada se dictará inmediatamente si las alegaciones, deposiciones . . . . . . demostraren que no hay *controversia real en cuanto a ningún hecho material*" . . . . . Así este Tribunal lo ha dicho y repetido en casos bien familiares, como lo han dicho y reafirmado otros tribunales de apelación. Pero como ocurre normalmente, exponer un principio de ley siempre es más fácil que aplicarlo, particularmente en la primera instancia donde no siempre las circunstancias y demás hechos en torno a un punto controvertido se presentan claramente deslindados con un definido perfil. Esa disposición así de sencilla en su expresión ha venido a ser el punto más sensible, tendón de Aquiles de este procedimiento; en torno a ella se ha producido la mayor divergencia de criterio entre las cortes de instancia y las cortes revisoras en la función de aplicarla a un cuadro de hechos y circunstan-

---

(³) Si el procedimiento de sentencia sumaria ha vencido ataques de inconstitucionalidad basados en que priva del derecho a un juicio por jurado garantizado en casos civiles por la Constitución Federal y por muchos Estados, ha sido precisamente considerándose que la Regla de su faz, y debidamente aplicada sin exceder su legítimo propósito y radio de acción, no priva de tal derecho por cuanto, si no hay una controversia real sobre los hechos nada tendría que dirimir un jurado como jueces de hecho. Cfr: *Lindsey* v. *Leavy*, (C.A. 9) 149 F.2d 899, 902, *certiorari* denegado, 326 U.S. 783; *Ex Parte Peterson*, 253 U.S. 300; *Fidelity & Deposit Co.* v. *United States*, 187 U.S. 315, 319; *General Inv. Co.* v. *Interborough Co.*, 235 N.Y. 133, 142; *Port of Palm Beach Dist.* v. *Goethals*, (C.A. 5) 104 F.2d 706, 709; *Page* v. *Work*, (C.A. 9) 290 F.2d 323, 334. Como dijera el Juez Cardozo ya en 1926, cuando aun este procedimiento no estaba tan generalizado como ahora: "El preciso objetivo de una moción sobre sentencia sumaria es separar lo que hay de superficial o simulado en la demanda o en la defensa de lo que es genuino y sustancial, de modo que sólo lo último sujete a un litigante a la carga de un juicio." *Richard* v. *Credit Suisse*, 242 N.Y. 346, pág. 350.

cias determinado. Antes de proceder a dictar sumariamente una sentencia el juzgador debe hacer un concienzudo examen de la situación de hecho y quedar absolutamente convencido, hasta donde es posible un juicio absoluto, de que tiene ante sí toda la verdad sobre los hechos, ya que se puede cometer una injusticia; y la revocación de una sentencia que no debió dictarse sumariamente, tras de la dilación y del tiempo transcurrido, meramente resuelve que un caso debe ir a juicio.

Aun cuando sea para el propósito más limitado de determinar si existe o no una controversia real de hecho, y no para adjudicar los derechos de las partes en el litigio, se requiere la formación de un juicio mediante la apreciación y aquilatación de los hechos y circunstancias proporcionados en el incidente de sentencia sumaria. Ante el gran cúmulo de disputas, anota Moore, no puede ofrecerse una fórmula rígida o mágica para determinar la existencia de una controversia real sobre un hecho pertinente. Está envuelto, en último análisis, el problema de juzgar.[4] Hay, sin embargo, en la doctrina, algunas normas de derecho firmemente sentadas que rigen el proceso de la apreciación y evaluación de esos hechos y circunstancias con miras, particularmente, a la función permisible de esta Regla. Seguir esas normas ayuda a la correcta disposición de una solicitud de sentencia sumaria y evita que su propósito se desvirtúe.

■ Una parte tiene derecho a un juicio plenario cuando existe la más leve o mínima duda en cuanto a cuáles son los hechos, expresó el Primer Circuito siguiendo una línea de autoridades en *Peckham* v. *Ronrico Corporation*, 171 F.2d 653, 657, un caso de nuestra Corte Federal en que se revocó una sentencia sumaria, y toda duda en cuanto a la existencia de una controversia real debe resolverse en contra de la parte que solicita la sentencia sumaria. Cfr: *Doehler Metal Furniture Co.* v. *United States*, 149 F.2d 130, 135; *Arnstein* v. *Porter*, 154 F.2d 464, 468; *Sarnoff* v. *Ciaglia*, 165 F.2d 167, 168; *Armco Steel Corp.* v. *Realty Investment Co.*, 273 F.2d

---

(4) Moore's—*op. cit.*, pág. 2103.

483; *Depositors Trust Company* v. *Maryland Casualty Co.*, 174 A.2d 288; *Purofied Down Products Corp.* v. *Travelers Fire Ins. Co.*, 171 F. Supp. 399; *National Screen Service Corp.* v. *Poster Exchange, Inc.*, 305 F.2d 647; *Traylor* v. *Black, Sivalls & Bryson, Inc.*, 189 F.2d 213; *Toebelman* v. *Missouri-Kansas Pipe Line Co.*, 130 F.2d 1016, 1018; *Weisser* v. *Mursan Shoe Corp.*, 127 F.2d 344, 346; *Cameron* v. *Vancouver Plywood Corp.*, 266 F.2d 535, p. 540.

■ La anterior norma responde también al reconocido principio de que sobre la parte que solicita sentencia sumariamente recae el peso de establecer, fuera de toda duda, la inexistencia de una controversia real sobre todo hecho pertinente que a la luz del derecho sustantivo aplicable determinaría una sentencia a su favor como cuestión de ley. El peso que en tal sentido recae sobre el promovente se ha dicho que es aún mayor que el peso de la prueba que de ordinario tiene un reclamante para establecer un caso. Sólo debe dictarse sentencia sumaria cuando el tribunal tiene ante sí toda la verdad sobre los hechos. No es suficiente con que estime que los hechos producidos le permiten dictar una sentencia en derecho, o que crea que los de la parte contra quien dicta sentencia sumaria tendrían poca oportunidad de prevalecer en un juicio. Cfr: *Sartor* v. *Arkansas Natural Gas Corp.*, 321 U.S. 620, 627; *Traylor* v. *Black, Sivalls & Bryson*, ante, p. 216: "Una sentencia sumaria es un remedio extremo que debe concederse sólo cuando la verdad es clara"; *American Insurance Co.* v. *Gentile Brothers Co.*, 109 F.2d 732, 735; *Spragne* v. *Voght*, 150 F.2d 795, 801; *Walling* v. *Fairmont Creamery Co.*, 139 F.2d 318, 322; *Kasper* v. *Baron*, 191 F.2d 737, 738; *Dulansky* v. *Iowa-Illinois Gas & Electric Co.*, 191 F.2d 881, 885; *Caylor* v. *Virden*, 217 F.2d 739, 741.

■ En la evaluación de los hechos y circunstancias para determinar si existe o no una disputa real sobre un hecho pertinente, el tribunal puede hacer uso de las presunciones de ley, del conocimiento judicial, de la cosa juzgada y de

cualquier otro elemento de prueba admisible, pero no se debe entrar en el aspecto de la credibilidad de esa prueba, a menos que ocurra la situación extrema de un hecho intrínsecamente inverosímil o irreal. Los hechos aportados por la parte contra quien se solicita la sentencia deben tomarse por ciertos, y todas las inferencias a derivarse de la prueba deben ser favorables a esa parte. Cfr: *Ramsouer* v. *Midland Valley R. Co.*, 135 F.2d 101, 106; *Dulansky* v. *Iowa-Illinois Gas & Electric Co.*, ante, a la pág. 884; *Caylor* v. *Virden*, ante, a la pág. 741; *Northwestern Auto Parts Co.* v. *Chicago*, B. & Q. R. Co., 240 F.2d 743, 746, *certiorari* denegado, 355 U.S. 815; *Moore* v. *New Amsterdam Casualty Insurance Company*, 199 F. Supp. 941, 946; *Allison* v. *Mennonite Publications Board*, 123 F. Supp. 23, 25; *Girard* v. *Gill*, 261 F.2d 695, 697.

Éstas y algunas otras normas igualmente sentadas que no vienen ahora al caso son de estricta aplicación contra la parte que solicita la sentencia sumaria. La razón básica es que tal sentencia, si fuere indebidamente dictada de manera sumaria, resulta injusta ya que priva a la parte del derecho fundamental a un juicio oral adversativo con el arma efectiva del contrainterrogatorio, que como dijera el Juez Jackson en el caso de *Sartor*, antes citado, es el mejor medio aún concebido para comprobar la fidelidad de un testimonio. También, si se considera que priva a la parte del factor de credibilidad inherente al comportamiento del testigo en corte. Según se dijo en *Colby* v. *Klune*, antes citado, el comportamiento o proceder del testigo ante el juzgador de los hechos constituye evidencia material que no aparece en un "*affidavit.*"

■ Si enjuiciamos la sentencia sumariamente dictada en este caso a la luz de las normas correctas, nos parece que con la situación de hecho que tenía ante sí la Sala sentenciadora, no debió haberse dictado. Se basó en que el demandante Roth no tenía causa de acción porque se había despren-

dido de su derecho de opción. Aparentemente, no toda la verdad sobre los hechos estaba ante la Sala. Cfr: *Poller* v. *Columbia Broadcasting*, 368 U.S. 464, 467. El demandante expuso bajo juramento, refiriéndose al contrato de 22 de octubre sobre la venta de la opción, que Nichols nunca adquirió la misma por cierto incumplimiento. Independientemente de que en definitiva resultara ser o no así, lo cual posiblemente hubiera requerido el testimonio o la intervención de Nichols, a los efectos de la Regla el hecho debía tomarse por cierto, máxime, cuando Roth no fue firmante ni intervino en la comunicación de Nichols a los dueños de la propiedad fechada 14 de noviembre de 1959. Por otra parte, está la comunicación de Roth al Lcdo. Castro Rivera de 9 de diciembre que insinúa que el negocio pudiera ser cerrado por Nichols, pero también está la carta de los dueños a Roth posterior, de 6 de febrero de 1960, recordándoles que dos días después, 8 de febrero, expiraba el término para el cierre final del convenio de opción que ellos (los dueños) le habían otorgado a él y a la señora Betancourt (la referencia es a la opción original), y le requerían a Roth el estricto cumplimiento. Las inferencias de esta carta, que en esta etapa debían ser adversas a los demandados y favorables a Roth como parte contra quien se solicitó la sentencia sumaria, Cfr: *United States* v. *Diebold, Inc.*, 369 U.S. 654, 655, implican que al momento de cerrarse el negocio en definitiva los dueños no le reconocían derecho alguno a Nichols y actuaban a base de la opción original dada a Roth. También Roth expuso bajo juramento que hizo arreglos ante notario y los demandados para la ejecución formal de la opción sin que éstos se presentaran en la fecha convenida.

Lo menos que puede decirse de ese cuadro de hechos es que deja una duda seria en cuanto a que no existiera una controversia fidedigna sobre si Roth había perdido o no su opción con el consiguiente derecho a ejercitar la misma. Posiblemente detrás de los documentos había una conducta de

una y otra parte que esclarecería la verdad, a ser traída mediante testimonio oral, con todos los elementos de credibilidad y demás inferencias permisibles al juzgador.

*Se revocará la sentencia sumariamente dictada en este caso y se devolverán los autos a la Sala sentenciadora para que celebre un juicio, o continúe los procedimientos de manera no incompatible con esta opinión.*